PD-1500-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 12/23/2015 2:41:17 PM
Accepted 12/23/2015 2:46:28 PM
ABEL ACOSTA
CLERK

PD – 1500 – 15

# IN THE COURT OF CRIMINAL APPEALS

## OF THE STATE OF TEXAS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### THE STATE OF TEXAS,

Appellant,

### V.

### LACI RENA WRIGHT,

Appellee.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On Appeal From The Court of Appeals, Eleventh Judicial
District, Eastland, Texas
Cause Number 11-13-00061-CR
The 42nd District Court of Taylor County, Texas
Honorable John Weeks, Presiding Judge
Trial Court Cause Number 24602-A

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## STATE'S PETITION FOR DISCRETIONARY REVIEW

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

James Eidson
Criminal District Attorney
Taylor County, Texas
300 Oak Street, Suite 300
Abilene, Texas 79602
325-674-1261
325-674-1306 FAX

BY: Britt Lindsey
Assistant District Attorney
400 Oak Street, Suite 120
Abilene, Texas 79602
State Bar No. 24039669
LindseyB@taylorcountytexas.org

## THE STATE REQUESTS ORAL ARGUMENT

No. 11-13-00061-CR

In The Court of Appeals

Eleventh Supreme Judicial District

At Eastland, Texas
*********************************************************************
The State of Texas, Appellant

V.

Laci Rena Wright, Appellee
*********************************************************************
## IDENTITY OF PARTIES AND COUNSEL

Appellee:   Laci Rena Wright

Appellant:   The State of Texas

Attorney for Appellee at trial:

Attorney for State:

  Stan Brown
  Attorney at Law
  P. O. Box 3122
  Abilene, Texas 79604

  James B. Hicks, III
  Assistant District Attorney
  300 Oak St., Suite 300
  Abilene, Texas 79602

Attorney for Appellee on Appeal:

Attorney for State on Appeal:

  Stan Brown
  Attorney at Law
  P. O. Box 3122
  Abilene, Texas 79604

  Britt Lindsey
  Assistant District Attorney
  400 Oak St., Suite 120
  Abilene, Texas 79602

Trial Court Judge:

  Honorable John Weeks
  42nd District Court, Taylor County Courthouse
  300 Oak St.
  Abilene, Texas 79602

i

# TABLE OF CONTENTS

Identity of Parties and Counsel.................................................................. i

Table of Contents .................................................................................. ii

Index of Authorities ............................................................................ iii

Statement Regarding Oral Argument ............................................... 1

Statement of Procedural History...................................................... 2

Statement of the Case....................................................................... 3

Grounds for Review One..................................................................... 3

    1. Did the Eastland Court of Appeals misapply the standard for legal sufficiency and for recklessness in reversing a conviction for injury of a child by omission by recklessly causing serious mental impairment or injury?

State's Argument ............................................................................... 3

Prayer.................................................................................................. 20

Certificate of Compliance ................................................................. 22

Certificate of Service......................................................................... 22

Appendix: Opinion of the Eleventh Court of Appeals...................23

# INDEX OF AUTHORITIES

## CASES

*Adames v. State,* 353 S.W.3d 854 (Tex. Crim. App. 2011).................. 6

*Bowen v. State,* 374 S.W.3d 427 (Tex. Crim. App. 2012).................. 20

*Gear v. State,* 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).............. 7

*Hooper v. State,* 214 S.W.3d 9 (Tex. Crim. App. 2007).................... 16

*Jackson v. State,* 17 S.W.3d 664 (Tex. Crim. App. 2000) .................. 6

*Jackson v. Virginia,* 443 U.S. 307 (1979)......................................... 6

*Marshall v. State,* 210 S.W.3d 618 (Tex. Crim. App. 2006)............. 20

*Thornton v. State,* 425 S.W.3d 289 (Tex. Crim. App. 2014) ............ 20

*Williams v. State,* 235 S.W.3d 742 (Tex. Crim. App. 2007)......... 5, 14

*Wright v. Texas,* --- S.W.3d ---, No. 11-15-00061-CR (Tex. App. –Fort Worth, delivered September 17, 2015) ......................................... 2

## STATUTES

TEX. PENAL CODE ANN. § 6.03.......................................................... 14

TEX. PENAL CODE ANN. § 22.04(a)..................................................... 12

TEX. PENAL CODE ANN. § 22.04(a)(1), (e) ......................................... 12

TEX. PENAL CODE ANN. § 22.04(a)(2), (e) .............................. 12, 13, 14

PD – 1500 - 15

IN THE TEXAS COURT OF CRIMINAL APPEALS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

LACI RENA WRIGHT,

APPELLANT

V.

THE STATE OF TEXAS,

APPELLEE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On Appeal From The Court of Appeals
Eleventh Judicial District, Eastland, Texas
Cause Number 11-13-00061-CR
The 42nd Judicial District Court of Taylor County, Texas
Honorable John Weeks, Presiding Judge
Trial Court Cause Number 24602-A

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TO THE HONORABLE COURT OF APPEALS:

Now comes The State of Texas, by and through the undersigned Assistant District Attorney and submits this Petition for Discretionary Review pursuant to TEX. R. APP. PROC. 68. The State further requests oral argument.

**STATEMENT REGARDING ORAL ARGUMENT**

This case presents a novel question regarding the application of the criminal charge of recklessly causing serious mental

1

impairment or serious mental injury to a child by omission. Because of the unusual issues presented in this case and its possible implications in future jurisprudence across the State involving the culpable standard of recklessness, the State believes oral argument would benefit the Court and respectfully requests the same.

## STATEMENT OF PROCEDURAL HISTORY

The Eleventh Court of Appeals in Eastland, Texas issued an opinion reversing the trial court on September 17, 2015. *Wright v. Texas,* --- S.W.3d ---, No. 11-15-00061-CR (Tex. App. –Fort Worth, delivered September 17, 2015). The State filed a motion for rehearing on October 2, 2015, which was denied on October 22, 2015.

## STATEMENT OF THE CASE

In the opinion issued on September 17, 2015, the Eastland Court of Appeals found that the evidence was insufficient to find Appellee guilty of recklessly causing serious bodily injury to B.R., and further the evidence was insufficient to find Appellee guilty of intentionally, knowingly or recklessly causing serious mental injury or serious mental impairment to B.R. The State now appeals the

2

last issue only: whether the evidence was legally insufficient to find that the Appellee recklessly caused serious mental impairment and injury to B.R. as alleged in Count Two, paragraph two of the indictment.

## GROUNDS FOR REVIEW

**1. Did the Eastland Court of Appeals misapply the standard for legal sufficiency and for recklessness in reversing a conviction for injury of a child by omission by recklessly causing serious mental impairment or injury?**

## STATE'S ARGUMENT

In the opinion issued on September 17, 2015, the Eastland Court of Appeals found that the evidence was legally insufficient to support the jury's finding that the Appellee was guilty of Injury to a Child by Omission by recklessly causing serious bodily injury to B.R. as alleged in Count One, paragraph two of the indictment, and that the evidence was legally insufficient that the Appellee was guilty of a second count of Injury to a Child by omission by intentionally or knowingly causing serious mental impairment and injury to B.R. as alleged in Count Two, paragraph one of the indictment. The Court further found that the evidence was

3

insufficient to find that the Appellee was guilty of Injury to a Child by omission by recklessly causing serious mental impairment and injury to B.R. as alleged in Count Two, paragraph two of the indictment. The State asks for a rehearing on the last issue only: whether the evidence was legally insufficient to find that the Appellee recklessly caused serious mental impairment and injury to B.R. as alleged in Count Two, paragraph two. The State believes the evidence to be legally sufficient on that charge and urges the court to reexamine the issue.

The opinion of the Eastland Court states that Appellee did not act knowingly because there is no evidence in the record that Appellee was aware that her failure to act was reasonably certain to cause serious mental impairment or injury. *Court's opinion at 17.* Addressing separately whether Appellee's actions reached the level of recklessness, the court notes that recklessness requires a person to foresee the risk involved and consciously decide to ignore it (citing *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007), ultimately concluding that even in a light most favorable to the verdict the evidence was insufficient for a rational jury to

conclude that she had the requisite mental state. *Court's opinion at 19-20.* It is the State's position that, taken in a light most favorable to the verdict, there was ample evidence for the jury to infer that the Appellee was consciously aware that her conduct carried the risk of causing or exacerbating the mental trauma suffered by B.R. and chose to disregard it. The State further takes the position that a reasonable jury could find that Appellee's failure to obtain medical care caused or exacerbated B.R.'s serious mental injury.

### Standard of Review

Legal sufficiency of the evidence is reviewed in a light most favorable to the verdict and the appellate court must determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 (1979); *Jackson v. State,* 17 S.W.3d 664 (Tex. Crim. App. 2000). The evidence is examined to determine if any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319; *Adames v. State,* 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). "In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in

5

the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt." *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011).

### *Factual background*

The victim in this case is Appellee's then four year old daughter, B.R. (RR4: 71) Appellee's daughter was sexually assaulted by Appellee's boyfriend Daniel Crippen in the early morning of November 11, 2009. At issue in this case is Appellee's conduct after learning of the sexual assault.

At approximately 2 am, Crippen woke Appellee and told her that he had just come home from work and found B.R. in her bedroom screaming and crying. (RR4: 74) Appellee found the child bleeding from a laceration in her vagina; she stated her vagina was a "purple/red color" and had what she described as a "chunk of skin missing." (RR4: 76) Appellee's statement to the police stated that B.R. told her that a strange man had come into her bedroom and sexually assaulted her. (RR4: 75) When the Appellee noticed the bleeding and lacerations on the child's vagina, instead

6

of immediately seeking medical attention she took photographs of her vagina and put Vagisil on it. (RR4: 76-77) Appellee did not take the child to the hospital, but instead examined her injuries, wiped off the blood, and took a video of B.R. explaining what happened. (RR4: 76-77) She used her video camera in her digital phone to videotape B.R. saying that a bad man "poked her" and stuck his hand inside he panties and twisted it, and that the man snuck out of the house and ran home because he knew "you (Appellee) and Daniel were there." (RR4: 75) Afterwards Appellee cleaned B.R. up and put her in bed with her and Daniel Crippen, the man who sexually assaulted her. (RR4: 34, 78) A spiral notebook was later found in the Appellee's home containing everything Crippen, the Appellee and B.R. said in the video and to police. (RR4: 91)

The following morning Appellee contacted a friend who was an Abilene police officer to ask how she should go about making a report of child molestation; the officer texted her back "need 2 go 2 hospital." (RR4: 79) Instead of taking B.R. to get medical help, she took her to daycare to drop her off. (RR4: 20, 79) At her

daycare Appellee spoke with B.R.'s daycare teacher, Candace South. (RR4: 24) South testified that Appellee told B.R. "now remember, I said don't talk about it and I will tell Ms. Candice what happened." (RR4: 21) Appellee told South that Crippen had found her "hysterical and crying and upset" the previous night. (RR4: 21) Appellee also told South that when she went to the child's room she found B.R. with blood on her underwear, nightgown, and sheets. (RR4: 22) She told South that she was going to make a doctor's appointment and then left. (RR4: 22-23) After Appellee left, South saw that B.R. had "blood all in her panties." (RR4: 23) South told daycare director Sandy Grisham what had taken place; they then notified CPS and took B.R. to the hospital and waited with her while attempts to locate Appellee were made to obtain parental consent for an examination. (RR4: 25-26) They waited for approximately an hour to two hours. (RR4: 27)

B.R. was examined by Susie Butz, a SANE nurse at the hospital. (RR5: 79-81) The examination revealed that B.R. had lacerations, cuts, and tears in her vaginal region and a complete cut

all the way through the hymen. (RR5: 87-88; RR9: SX 57) The wounds were still oozing blood, the tissue was torn, and there was extensive bruising. (RR5: 91-93, 100-102) In Butz's words, the skin in the vagina was "purple, red and there were chunks of skin missing." (RR5: 90) Butz testified that from age two until puberty touching the hymen would be very painful to touch. (RR5: 80-82) She stated that without training it would be very painful to separate the lips of the vagina and could cause more tearing in the area. (RR5: 90-92) She stated that the tearing would leave a scar that would be much worse and more painful than an episiotomy scar. (RR5: 93-94) Butz testified that the pain B.R. endured for those hours after the assault could have been relieved to some degree if B.R. had been given sitz baths and Tylenol and that she told Appellee the importance of sitz baths. (RR5: 95, 104-105)

On November 11, 2009, the same evening that Crippen was arrested, Appellee's children were placed with the maternal grandparents, Buddy and Sherry Morgan. (RR6: 5-8, 10-12) Sherry testified at trial that B.R was still bleeding when they took her home that evening. (RR6: 12, 16-17) She testified that B.R.

9

was terrified, had nightmares, and would only sleep on the living room floor. (RR6: 12) Sherry kept B.R. out of school until her bleeding stopped on November 16. (RR6: 17)

On November 19, CPS arranged for Appellee to speak to the children by telephone. (RR6: 18) Sherry Morgan later testified that the call upset B.R. and that her stomach began hurting her the next morning. (RR6: 19-21) Shortly thereafter she began vomiting, which resulted in her being hospitalized for vomiting, gastritis, and abdominal pain from November 22 to November 27. (RR6: 19-24) A letter written by B.R.'s pediatrician and dated July 8, 2010 stated that while it is impossible to be certain that it was "highly likely probable that her gastritis was secondary to the stress of her sexual assault." (RR9: DX 3, p.31)

Sherry Morgan described B.R. as a "happy kid, seemed normal, happy child" before the assault, but said since then her behavior changed. (RR6: 12) She has "meltdowns" and will throw herself to the floor, pull her hair out and pick at her toe nails until they bleed. (RR6: 15-16) Morgan testified that she initially had meltdowns almost every day, but that she has improved since she

10

began counseling with her counselor, Monica Reid. (RR6: 24-25) South also testified that she noticed a change in B.R. (RR4: 19-21) She stated B.R. was a bubbly, outgoing little girl until the assault. (RR4: 19-20) After the assault, B.R. is scared, cautious, and has become very attached to her. (RR4: 19-20)

*Analysis*

Appellee was charged in an amended indictment with two counts of injury to a child by omission for failing to provide medical care. TEX. PENAL CODE ANN. § 22.04(a). (CR2: 501-503) Count one, paragraph one alleged intentionally and knowingly causing serious bodily injury to a child by omission. TEX. PENAL CODE ANN. § 22.04(a)(1), (e). (CR2: 502) Count One, paragraph two alleged recklessly causing serious bodily injury to a child by omission. *Id.* (CR2: 502) Count Two, paragraph one alleged intentionally or knowingly causing serious mental impairment or serious mental injury to a child by omission TEX. PENAL CODE ANN. § 22.04(a)(2), (e). (CR2: 502) Count Two, paragraph two alleged recklessly causing serious mental impairment or serious mental injury to a child by omission. TEX. PENAL CODE ANN. § 22.04(a)(2), (e). (CR2:

11

503)  The jury found Appellee guilty on Count one, paragraph two and guilty on Count two, paragraph one.  (CR2: 523-524; RR8: 106-108)  The trial court assessed punishment at five years on each count probated for eight years.  (CR2: 528-535; RR9: 80)

The Eastland Court found that even in the light most favorable to the state that there was no  evidence in the record that Appellee was aware that her failure to act was reasonably certain to cause B.R. serious mental impairment or injury or that B.R.'s PTSD would have been prevented had she provided such care. *Court's Opinion at 17.* The Eastland Court further found that there was insufficient evidence that if the Appellee had provided medical care to B.R. that the medical care would have prevented B.R. from suffering PTSD in light of the sexual assault committed by Crippen. *Id.* The State would address each in turn.

## I.  *Appellee's Conscious Disregard of the Risk*

The Eastland Court noted that committing the offense of injury to a child with the culpable mental state of recklessness would be a lesser included offense of Appellee's conviction for intentionally or knowingly committing injury to a child by causing

serious mental impairment or injury. *Court's opinion at 19;* TEX. PENAL CODE ANN. § 22.04(a)(2), (e). The court noted that "[a] person acts recklessly...when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or that the result will occur" and that the risk "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* § 6.03.

The court further noted that recklessness requires a person to foresee the risk involved and consciously decide to ignore it (citing *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16.

The Eastland Court found that "[w]hile the National Center for PTSD declares the proposition that '[t]he best predictor of recovery [for victims of child sexual abuse] is support and love

from their main caregiver,' there is no evidence that this fact was known by (Appellee) or the public at large." *Court's opinion at 18* (brackets in original). The State would urge that it is not necessary to impute a professional level of knowledge to Appellee to find that she was consciously aware of the risk; there was ample evidence in the record for a reasonable jury to make that finding. It is not mere speculation to find that a person in that circumstance knows that a child expects medical care from her primary caregiver, and that they are disregarding the risk of traumatizing them when they do not provide it. B.R. herself confirmed this in play therapy when she said that her babies were sick and that she was going to take them to the hospital. (RR7: 98) Given the evidence and testimony presented to the jury. It is not mere speculation that Appellee consciously disregarded a substantial risk, but a logical inference from the evidence.

II. *Evidence that Appellee's failure to obtain medical care caused or exacerbated B.R.s serious mental injury:*

The Court further states in its opinion that "the evidence that Appellee's acts and omissions caused B.R. serious mental

14

impairment or injury is also insufficient. Based upon the evidence offered at trial, the conclusion that Appellee's conduct caused mental injury over and above that caused by Crippen's aggravated sexual assault is a matter of conjecture and speculation." *Court's opinion at 18* (citing *Hooper v. State,* 214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007). The State would respectfully urge that an examination of the witnesses' testimony regarding the trauma suffered by B.R. in a light most favorable to the verdict, particularly that of the counselor who treated her, shows that this is not the case.

Several witnesses testified as to the emotional trauma suffered by B.R. Her daycare worker said that before the sexual assault she was a bubbly, outgoing little girl, but after the assault became scared, cautious, and very attached to her. (RR4: 19-20) B.R.'s grandparents said that she would only sleep on the floor for several weeks and suffered emotional upheavals, nightmares and meltdowns. (RR6: 12-16) After the assault, B.R. had periods of incessant vomiting; the last five day session of vomiting coincided with her last conversation with the Appellee. (RR6: 9-11, 19-26)

B.R.'s counselor, Monica Reid, diagnosed her with post-traumatic stress disorder (PTSD). (RR6: 63) When asked whether Crippen or the Appellee caused her PTSD, Ms. Reid stated that they both did. (RR6: 68) When she was asked whether she thought Appellee contributed to B.R.'s stress disorder, Ms. Reid replied "yes, absolutely I do." (RR6: 68) She stated that love and care after acute stress disorder is "profoundly important," and went on to explain that "the key factor in how kids might – how if they're going to recover from the traumatic event is how the primary caregiver or the kind of response they have from the nurturing adults around them." (RR6: 77-78) She stated that getting none of this sort of care raises the risk factors for PTSD drastically. (RR6: 78) She stated that she believed the Appellee bore a great deal of responsibility. (RR6: 81) She testified that it was her opinion that the post-traumatic stress disorder that B.R. suffered could have been alleviated or eliminated if Appellee had gotten her medical care. (RR7: 77) She testified that when she they discussed her mother B.R.'s mood would shift; she would be anxious, her play would change, and she would show confusion, ambivalence, and

uncertainty. (RR7: 87-88) Based on what she saw, Monica Reid recommended to CPS that visitation between B.R. and Appellee be terminated until B.R. was more emotionally and psychologically stable. (RR7: 91-92) She stated she believed that the mother's reaction was more distressing to B.R. than the sexual assault itself because she could talk boldly about Daniel Crippen but her presentation was more distressing in discussion of her mother. (RR7: 105) Even the expert witness called by Appellee, Dr. John Crowley, agreed that the reaction of a parent to the traumatic event would be a factor in the development of the syndrome and its severity. (RR8: 25) Given this testimony the State does not believe it can be fairly said that no reasonable jury could find that the serious mental injury suffered by B.R. could be attributed to Appellee.

The opinion of the Eastland Court of Appeals, if allowed to stand as precedent, significantly raises the bar on the proof required to find that a criminal defendant acted with a conscious disregard of the risk. In saying that no reasonable jury could find that the Appellee acted recklessly, the court essentially disallows

the jury the right to make reasonable inferences from a defendant's behavior and the descriptions of that behavior from witnesses. This will make it next to impossible to find that a defendant acted recklessly except for those rare circumstances in which a defendant actually verbalizes that they are consciously aware of the risk. The State would respectfully urge that the Eastland Court has disregarded the evidence that a reasonable jury could rely on to find that Appellee recklessly caused serious mental impairment or injury to B.R. and taken the legally impermissible step of substituting the court's findings and judgment for the findings and judgment of the jury. *See Marshall v. State,* 210 S.W.3d 618, 624 (Tex. Crim. App. 2006).

As the Eastland Court notes, there are instances where the courts of appeal may modify and render a judgment of conviction for a lesser included offense when the court determines the evidence insufficient for the greater inclusive offense. *Bowen v. State,* 374 S.W.3d 427, 432 (Tex. Crim. App. 2012); *Thornton v. State,* 425 S.W.3d 289 (Tex. Crim. App. 2014). The State urges

18

that that is the appropriate resolution in this case as to Appellee's conviction for Count Two of the indictment.

## PRAYER FOR RELIEF

The State respectfully requests that this Court grant oral argument and prays that this Court reverse the ruling of the Court of Appeals and modify and render judgment to reflect that Appellee is guilty of recklessly causing serious mental impairment or serious mental injury to a child by omission. *See* TEX. R. APP. P. 78.1.

Respectfully submitted,

James Eidson
Criminal District Attorney
Taylor County, Texas
300 Oak Street
Abilene, Texas 79602
325-674-1261
325-674-1306 FAX


BY:  /s/ Britt Lindsey
BRITT LINDSEY
Assistant District Attorney
Appellate Section
400 Oak Street, Suite 120
Abilene, Texas 79602
325-674-1376
325-674-1306 FAX

19

State Bar No. 24039669

Attorney for the State

## CERTIFICATE OF COMPLIANCE

I, Britt Lindsey, affirm that the above brief is in compliance with the Rules of Appellate Procedure per my computer generated word count. The font size in the brief is 14 pt. with the exception of footnotes that are 12 pt. The word count is 3129, excluding the exceptions listed in Rule 9.4. The word count of the entire brief is 4193.

/s/ Britt Lindsey
BRITT LINDSEY

## CERTIFICATE OF SERVICE

I certify that on this 23rd day of December, 2015, a true copy of the foregoing State's Brief was served on the Attorney for Appellee and State Prosecuting Attorney according to the requirements of law by first class mail, email or hand delivery to:

Stan Brown
Attorney at Law
P. O. Box 3122
Abilene, Texas 79604

Attorney for Appellee, Laci Rena Wright

Email: mstrb@aol.com

Lisa C. McMinn
State Prosecuting Attorney
209 W. 14th Street
Austin, Texas 78701

Email: information@SPA.texas.gov

/s/ Britt Lindsey
BRITT LINDSEY

22

# APPENDIX: OPINION OF THE 11TH COURT OF APPEALS

Opinion filed September 17, 2015



In The

# Eleventh Court of Appeals

No. 11-13-00061-CR

**LACI RENA WRIGHT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 42nd District Court

Taylor County, Texas

Trial Court Cause No. 24602A

## OPINION

Laci Rena Wright appeals her jury convictions for two counts of injury to a child by omission. The trial court assessed Appellant's punishment on each conviction at confinement for a term of five years in the Institutional Division of the Texas Department of Criminal Justice, with the sentences to be served concurrently. However, the trial court suspended the imposition of the confinement portion of Appellant's sentences and placed her on community supervision for a term of eight

years. In two issues on appeal, Appellant challenges the sufficiency of the evidence to support her convictions. We reverse and render judgments of acquittal.

## Background Facts

Appellant's boyfriend, Daniel Crippen, sexually assaulted Appellant's four-year-old daughter, B.R., in the early morning hours of November 11, 2009. Appellant's convictions arise from her conduct in response to the sexual assault. In her written statement to the police, Appellant stated that Crippen awoke her at approximately 2:00 a.m. to report that he had just come home from work and that he had found B.R. sitting on her bed screaming and crying. According to Appellant, Crippen told her that "all [B.R.] would say was, 'He poked me.'" Appellant's account of her response to Crippen's report is as follows:

> I went into [B.R.'s] bedroom and she was sitting on the middle of her bed holding her crotch. I didn't even ask [B.R.] what happened before she started telling me that a man poked her. [B.R.] said the man had his hand on her mouth and she was crying. She said he came in her bedroom and held her down so she couldn't move her arms and he had his hand on her mouth. [B.R.] said she tried to ask him to please stop but he wouldn't move his hand. [B.R.] said the man said, "No, I ain't gonna stop." [B.R.] then started describing the man without me ever asking her to. [B.R.] said the man's hand was dirty and it smelled nasty. She also described his hand as being hairy. She described him as having a deep voice. [B.R.] said he stuck his hand inside her panties and twisted it. She pointed her index finger and made a twisting motion with her hand as she was describing this. [B.R.] said the man snuck out of the house and ran home because he knew [Crippen] and I were there. I started questioning [B.R.] more about the man's description and she said that the man had long hair. She said she felt his leg on her leg and he had long pants on. [B.R.] also described the man as wearing a white hat with a giraffe on it. [B.R.] also said that the man had long finger nails.
>
> I asked [B.R.] to let me see her bottom where the man had poked her. [B.R.] lifted her nightgown (which is actually a white slip) and I saw the blood on her crotch on the outside of her panties. I had her lay

back and I looked inside her panties and saw the blood. I asked [Crippen] if he had done this to her and he said no. I asked [Crippen] if he had seen anyone leaving the house and he said no. [Crippen] said he made a bacon sandwich out of the leftover bacon I had made the previous night (before I went to bed) when he heard [B.R.] crying.

I went and got some toilet paper to remove the blood so I could see better. I then saw that [B.R.'s] skin under her vagina was a purple red color and there was a chunk of skin missing. She said it hurt her when I touched her there to clean the area. I went to my bedroom to get my phone, my camera, and my cigarettes. That's when I saw that it was 2:15 A.M. I then went back into [B.R.'s] room because she was yelling for me. [B.R.] said her bottom was hurting so I told her to let me look so I could take pictures. As I was looking at it, I touched it so I could see better. [B.R.] said it hurt when I touched her and she asked me to be careful. I photographed [B.R.'s] vaginal area, her panties, and the sheets where there were a few small marks of blood. I also used the video camera feature on my digital camera to video [B.R.] telling what had happened. No one told [B.R.] what to say before I videotaped her. [B.R.] asked me to get some medicine and put it on her like what I put on myself when I hurt down there. [B.R.] had seen me put medicine on myself before and she had asked what it was. I told her it was big girl medicine that big girls use when it hurts down there. I went and got my Vagisil and put some on her after she asked me to. I also put different panties on [B.R.].[1]

Despite her four-year-old daughter's alleged report of being sexually assaulted in her bedroom by a stranger, Appellant did not call the police and she did not transport her daughter to the hospital to be examined and treated for her injuries. After conducting her own examination of her daughter's injuries and taking photographs of them, Appellant put B.R. back to bed and "went to the living room and smoked a cigarette."

---

[1]At the time she gave her statement to the police, Appellant was not aware that Crippen had given a written statement to the effect that he was the person that injured B.R.

3

Appellant then went back to bed until 6:45 a.m. when she received a call from her mother "to make sure I was up so I could get the boys ready for school." Appellant did not report the incident involving B.R. to her mother during the phone call. While taking B.R.'s two brothers to school, Appellant texted an Abilene police officer that she had dated in high school and asked him, "How do I go about making a report about suspected child molestation?" Appellant indicated that the officer responded, "Need 2 go 2 hospital." Appellant did not follow the officer's advice. Instead, she took B.R. to daycare after first going to the Eskimo Hut to get a drink.

Candice South worked at the daycare that B.R. attended. She was in charge of B.R.'s class. On the morning of November 11, Appellant brought B.R. to the daycare. South testified that Appellant seemed to be "very distraught and upset." In South's presence, Appellant told B.R. not to "talk about it" and that Appellant was going to tell "Ms. Candice what happened." South then stated that Appellant told her as follows:

> [Appellant] told me that the day before had been the day from hell and that one of her boys was sick to his stomach and that the other one -- she had been having trouble getting him to sleep at night, so she was up trying to get him to sleep. And when she finally got one of them to sleep, she checked on the other two and they were asleep and that she had gone to bed. Then she said about 2:30 her boyfriend woke her up and said that [B.R.] was hysterical and crying and upset and he couldn't get her to calm down.
>
> . . . .
>
> That she got up out of bed and went into [B.R.'s] room and that there was blood on [B.R.'s] underwear, her night gown and on her sheets. And she asked [B.R.] what happened and [B.R.] had told her that a man had come in with a mask on his face and put his hands in her underwear and hurt her.

Appellant also advised South that was she was going to try to make a doctor's appointment for B.R.

4

After Appellant left the daycare, B.R. asked South to accompany her to the bathroom. South testified that this was an unusual request from B.R. B.R. reported to South that she was bleeding and that her stomach was hurting. South then observed blood in B.R.'s underwear. South reported her observations to the director of the daycare, Sandy Grisham. South and Grisham reported the matter to CPS and the police. South and Grisham subsequently transported B.R. to the emergency room at Hendrick Medical Center based on the request of the responding police officer.

Hospital personnel were unable to examine B.R. until Appellant was located so that she could provide consent for the examination. Grisham and South testified that they made numerous attempts to contact Appellant by telephone. Appellant arrived at the hospital after approximately two hours. Upon her arrival at the hospital, Appellant gave consent for B.R. to be examined by a sexual assault nurse examiner (SANE).

Susie Butz is the SANE that examined B.R. at Hendrick. Butz testified to the account that B.R. gave to her about a man putting his fingers inside of her. Butz examined B.R.'s vagina as a part of her examination. She observed a complete transection of B.R.'s hymen that was still oozing blood. She also observed that the skin in her vagina was "purple, red and there were chunks of skin missing." Butz additionally observed a tear of the posterior fourchette of the vagina. Butz attributed these injuries to be caused by "some sort of blunt force trauma." Butz testified that B.R. "probably would [have] a scar there" after it healed. She also testified that it was a very painful injury to B.R.

When asked on cross-examination if she gave B.R. any medical treatment, Butz replied, "Not really." She elaborated upon her response by stating that B.R. was supposed to follow up with her pediatrician and that she explained to Appellant the importance of having B.R. do sitz baths. Butz later clarified that sitz baths were

"pretty much" the only treatment that could have been given along with Tylenol for pain relief.

Detective Erin Bennett of the Abilene Police Department arrived at the hospital at 11:24 a.m. She testified that Appellant arrived at the hospital at 12:05 p.m. Detective Bennett remained with Appellant for six and one-half hours after Appellant executed the authorization for B.R. to be examined at the hospital. After conferring with Appellant at the hospital for thirty to forty minutes, Detective Bennett asked Appellant to meet her at the Law Enforcement Center so that Appellant could be further interviewed there and for B.R. to undergo a forensic interview. Detective Bennett eventually obtained Appellant's written statement at the end of the day. Detective Bennett arrested Appellant at that time for failure to report child abuse. See TEX. FAM. CODE ANN. § 261.109(a) (West 2014). One month later, Officers made the decision to charge Appellant with injury to a child by omission based on problems that B.R. subsequently developed.

Detective Stacy Cisneros led the investigation of Crippen for assaulting B.R. His work on the case included a search of the couple's home on the day of the offense. He located a spiral notebook in the bedroom that Crippen and Appellant shared. The notebook contained a handwritten account of what purportedly transpired with B.R. Crippen told Detective Cisneros that both he and Appellant prepared the handwritten note. Detective Cisneros obtained a written statement from Crippen. In his written statement, Crippen stated that, in picking up B.R., his "hand slipped and went inside [B.R.'s] vagina." He also indicated in his statement that he had not told the truth "right away." Crippen subsequently pleaded not guilty to the aggravated sexual assault of B.R. A jury convicted him of the offense on May 19, 2011.

Appellant did not have custody of B.R. at any time after November 11, 2009. Appellant's mother, Sherri Morgan, assumed custody of B.R. and B.R.'s brothers

6

that night after Appellant was arrested. Morgan testified that B.R. was not the same immediately after the incident. B.R. had nightmares and experienced bleeding for several days. Morgan kept B.R. out of daycare until November 16, at which time the bleeding had stopped. She also sought counseling for B.R. at this time.

B.R. was hospitalized on November 22, 2009. The admission records indicate that she was hospitalized with the chief complaint of vomiting that began two days earlier.[2] Morgan testified that CPS arranged for Appellant to speak with her children by telephone on November 19. Morgan stated that the call upset B.R. and that her stomach began hurting her the next morning. B.R. remained hospitalized until November 27. The discharge summary for the hospital admission indicated that B.R. was discharged with a diagnosis of "[v]omiting and gastritis" and "[a]bdominal pain." On July 8, 2010, B.R.'s pediatrician prepared a letter addressed "To Whom it May Concern" that provided as follows regarding the hospital admission:

> On 11/22/2009 [B.R.] was hospitalized at Hendrick Medical Center for persistent vomiting. She had an extensive work-up which ruled out infections or anatomic cause. Final diagnosis was gastritis. While we cannot be certain, it is highly likely probable that her gastritis was secondary to the stress of her sexual assault.[3]

Monica Reid worked as an intern counselor at the Regional Crime Victim's Crisis Center in November 2009 in pursuit of her certification as a licensed professional counselor. She subsequently obtained her license in October 2010. Reid saw B.R. as a patient for the first time on November 16 and continued to see her off and on for three years. She initially diagnosed B.R. with acute stress disorder.

---

[2]The admission records also indicated that B.R. was seen by her pediatrician on November 12 as a follow-up to her evaluation in the emergency room by Butz.

[3]Morgan testified that B.R.'s pediatrician prepared the letter at her request in support of paperwork she submitted to "Crime Victim's Compensation."

Reid subsequently diagnosed B.R. with post traumatic stress disorder (PTSD) after she continued to suffer acute stress disorder for longer than four weeks.

In describing B.R.'s history, Reid stated that Appellant's response to the sexual assault was "kind of bizarre" and that there was a delay in "responsive medical help." She also indicated that there was "a lot of confusion" with B.R. "about who the perpetrator was." Reid opined that both Crippen and Appellant caused B.R.'s PTSD and that she continued to suffer from PTSD at the time of trial. With respect to Appellant's individual responsibility for B.R.'s PTSD, Reid testified that she believed that Appellant contributed to it. Reid indicated that Appellant could have significantly alleviated some of the problems that B.R. suffered "if she had been a nurturing mom." Reid provided the following testimony in this regard:

> Q. Is it important in your opinion as a professional that a person that has acute stress disorder she has someone immediately there to love and care for her?
>
> A. Profoundly important. We know that the key factor in how kids might -- how if they're going to have a post traumatic stress or how they're going to recover from the traumatic event is how the primary caregiver or the kind of response they have from the nurturing adults around them. They take ques [sic] on how to make meaning of the situation and definitely need a lot of nurturing and support.
>
> Q. So if they get none, does that have a profound affect [sic] on the severity of this disorder?
>
> A. Yes. It raises the risk factors of developing PTSD drastically. It could exacerbate their perception of that. Like I say, it's coming from experience, it's not just how they perceive it. So everything surrounding that adds to that whole trauma experience for them.
>
> Q. Is that one of the reasons you formed an opinion as to what [Appellant] did to her daughter?
>
> A. Yes.

Q. Did you ever form an opinion as to whether [Appellant] intentionally or knowingly caused mental injury to her daughter[?]

A. Not in those legal terms, but I did think about her state of mind. I think of her mental state of mind in the response of what was happening with her daughter.

Q. In your professional world, could she have alleviated some of the problems her daughter now suffers from if she had been a nurturing mom?

A. I believe she could have yes, significantly.

*Analysis*

We review a sufficiency of the evidence issue under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). When conducting a sufficiency review, we consider all the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the

9

prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778. We are responsible for ensuring "that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

Appellant was indicted for two counts of injury to a child by omission. *See* TEX. PENAL CODE ANN. § 22.04 (West Supp. 2014). Count One alleged that Appellant caused "serious bodily injury" to B.R. by omission by failing to provide medical treatment to B.R. *See id.* § 22.04(a)(1). Count One contained two paragraphs alleging different culpable mental states. The first paragraph alleged that Appellant "intentionally and knowingly" caused serious bodily injury by omission. The second paragraph alleged that Appellant "recklessly" caused serious bodily injury by omission. Count Two alleged that Appellant caused "serious mental impairment and injury" to B.R. by omission by failing to provide medical treatment to B.R. *See id.* § 22.04(a)(2). Count Two also contained two paragraphs with the first paragraph alleging the culpable mental states of "intentionally and knowingly" and the second paragraph alleging the culpable mental state of "recklessly."[4]

The trial court submitted both counts alleged in the indictment with each of the alleged culpable mental states to the jury. The jury found that Appellant recklessly caused serious bodily injury under Section 22.04(a)(1) as alleged in Count One, paragraph two of the indictment. The jury also found that Appellant intentionally or knowingly caused serious mental impairment or injury under Section 22.04(a)(2) as alleged in Count Two, paragraph one. "Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct." *Williams*, 235 S.W.3d at 750 (citing *Alvarado v.*

---

[4]Under Section 22.04(e), an offense under subsection (a)(1) or (2) is a felony of the first degree when the conduct is committed intentionally or knowingly. PENAL § 22.04(a)(1), (a)(2), (e). An offense under subsection (a)(1) or (2) is a felony of the second degree when the conduct is engaged in recklessly. *Id.*

*State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). The State has the burden to prove that the defendant caused a child's serious bodily injury with the requisite criminal intent. *Id.*

In her first issue, Appellant challenges the sufficiency of the evidence to support her conviction under Count One for recklessly causing serious bodily injury to B.R. She focuses her evidentiary challenge to the sufficiency of the evidence on the proposition that she *"recklessly caused some additional and identifiable serious bodily injury"* to B.R. by not getting her prompt medical treatment. Appellant contends that the jury's finding as to this element was not rational based upon the evidence presented at trial. We agree.

The existence or nonexistence of a causal connection is a question for the jury's determination. *Fountain v. State*, 401 S.W.3d 344, 358–60 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see Dorsche v. State*, 514 S.W.2d 755, 757 (Tex. Crim. App. 1974). Count One of the indictment alleged that Appellant caused serious bodily injury by omission by failing to provide medical treatment to B.R. after an injury that caused bleeding to her female sexual organ. "Serious bodily injury" means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. PENAL § 1.07(a)(46). The State asserts that B.R. suffered serious bodily injury based upon the scarring that Butz testified that B.R. will have as a result of the sexual assault. The State asserts in its brief that Appellant's acts of inspecting B.R.'s injury and photographing it *"could have reasonably caused more physical injury to B.R."* (emphasis added). In an attempt to tie these matters together, the State additionally contends that, "[b]ecause Butz could not say with certainty that appellant did not further injure B.R., the resulting scarring can be partially attributed to appellant's actions."

Even if one assumes that B.R.'s scarring constitutes serious bodily injury,[5] the evidence that Appellant caused the scarring is not sufficient. Under the Penal Code, "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." PENAL § 6.04(a) (West 2011). "But for" causation, as referred to in Section 6.04(a), must be established between an accused's conduct and the resulting harm. *See Robbins v. State*, 717 S.W.2d 348, 351 (Tex. Crim. App. 1986). When concurrent causes are present, the "but for" requirement is satisfied when either (1) the accused's conduct is sufficient by itself to have caused the harm or (2) the accused's conduct coupled with another cause is sufficient to have caused the harm. *Id.* If an additional cause—other than an accused's conduct—is clearly sufficient by itself to produce the result and if the accused's conduct by itself is clearly insufficient, then the accused cannot be convicted. *Id.*

The State's case against Appellant is one involving concurrent causes. It is undisputed that Crippen's aggravated sexual assault of B.R. was the initial, primary cause of B.R.'s injuries. In this regard, Crippen's sexual assault was a heinous act that no doubt caused a significant, traumatic injury to B.R. Crippen's sexual assault was obviously sufficient by itself to produce the result in the form of the physical injuries and mental injuries that B.R. suffered. Appellant's criminal culpability for injury to a child by omission under both counts hinges on her response to Crippen's acts.

---

[5]Simply that an injury causes scarring is not sufficient, on its own, to establish serious permanent disfigurement. *Sizemore v. State*, 387 S.W.3d 824, 828 (Tex. App.—Amarillo 2012, pet. ref'd); *Hernandez v. State*, 946 S.W.2d 108, 113 (Tex. App.—El Paso 1997, no pet.). A reviewing court must find more than mere scarring alone; instead, it must find in the record evidence of "some significant cosmetic deformity" in order to conclude that the evidence of serious bodily injury was sufficient. *Sizemore*, 387 S.W.3d at 828 (quoting *Hernandez*, 946 S.W.2d at 113) (internal quotation marks omitted).

The facts in this appeal are similar to other cases in Texas involving charges of injury to a child by omission based upon a failure to provide medical care. An analysis of some of these cases is instructive to the issues in this appeal. The defendant in *Dusek v. State* was convicted of intentionally or knowingly causing serious bodily injury to a child by omission by, among other things, failing to provide prompt medical treatment for the child's broken leg. 978 S.W.2d 129, 133 (Tex. App.—Austin 1998, pet. ref'd). The court noted in its analysis that the child's broken leg was a serious bodily injury. *Id.* The court further noted, however, that injury to a child is a "result of conduct" offense. *Id.* (citing *Alvarado*, 704 S.W.2d at 39). Accordingly, under Section 22.04, it was not sufficient for the State to prove that the defendant failed to provide medical care for a serious bodily injury. *Id.* Instead, it was necessary to prove that the child suffered serious bodily injury because the defendant failed to provide medical care. *Id.* In determining that the evidence was insufficient to support a conviction for failing to provide medical treatment, the *Dusek* court noted that there was no evidence that any omission on the defendant's part aggravated the seriousness of the injury. *Id.*

In *Payton v. State*, the defendant was convicted of recklessly causing serious bodily injury to his eighteen-month-old grandson by failing to obtain reasonable medical care for him. 106 S.W.3d 326, 327–28 (Tex. App.—Fort Worth 2003, pet. ref'd). The defendant observed his grandson crying in the hallway and lying in the floor at approximately 8:30 a.m. *Id.* at 328. He noticed that the child was having difficulty holding a bottle and that his feet were cold. *Id.* He called a friend that was a nurse who arrived at his house in approximately fifteen minutes. *Id.* The friend determined that the child needed emergency medical attention because he was nonresponsive and had possibly aspirated. *Id.* The emergency medical personnel and physicians that subsequently treated the child determined that the child had bruises all over his body and suffered from internal bleeding. *Id.* The child died a

13

short time later. *Id.* A physician testified that the child's injuries would have occurred between ten to twelve hours before his death and that the child would have been showing symptoms from his injuries. *Id.* at 329.

The defendant in *Payton* challenged the sufficiency of the evidence to establish that he caused serious bodily injury by failing to seek reasonable medical care. *Id.* Citing *Dusek*, the court held that, under Section 22.04, it is not sufficient for the State to prove that the defendant failed to provide medical care for a serious bodily injury. *Id.* "Instead, it is necessary to prove that [the child] suffered serious bodily injury because [the defendant] failed to provide him medical care." *Id.* The court determined that the evidence was sufficient with regard to causation because there was evidence that the child might have lived had the defendant called for emergency care earlier. *Id.* at 330.

Thus, under Section 22.04, it was not sufficient for the State to prove that Appellant failed to provide medical treatment for a serious bodily injury. *See Payton*, 106 S.W.3d at 329; *Dusek*, 978 S.W.2d at 133. Instead, it was necessary to prove that B.R. suffered serious bodily injury because Appellant failed to provide her with medical treatment. *See Payton*, 106 S.W.3d at 329; *Dusek*, 978 S.W.2d at 133. The State alleged in the indictment that Appellant committed injury to a child by omission by failing to provide medical treatment to B.R. after an injury. In the context of the allegation alleged in the indictment, the evidence did not show that any delay in medical treatment attributable to Appellant caused B.R. any additional physical injuries because no medical treatment was given to B.R. when Butz examined her at the hospital.

14

The State expanded its theory of the case at trial by asserting that Appellant's actions in examining and photographing B.R. contributed to B.R.'s injuries.[6] The State continues this argument on appeal. However, there is no evidence that anything Appellant did or did not do aggravated the seriousness of the physical injuries inflicted by Crippen. At best, the evidence does nothing more than suggest that Appellant "could have reasonably caused more physical injury to B.R." as noted by the State in its brief. "While juries are permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial, 'juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions.'" *Winfrey*, 393 S.W.3d at 771 (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)). "[A]n inference is a conclusion reached by considering other facts and deducing a logical consequence from them," while "[s]peculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Hooper*, 214 S.W.3d at 16. "A conclusion reached by speculation . . . is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt." *Id.* The conclusion that Appellant caused B.R. to suffer a serious bodily injury or that she might have

---

[6]Modern legal theory and the Texas Penal Code recognizes a conceptual distinction between an "act" and an "omission." *Hill v. State*, 913 S.W.2d 581, 589–90 (Tex. Crim. App. 1996). As noted by the court in *Hill*:

> Our Penal Code provides that a person commits an offense only if he commits an *act* or an *omission*. TEX. PENAL CODE ANN. § 6.01(a). An "act" is defined as "a bodily movement, whether voluntary or involuntary, and includes speech." TEX. PENAL CODE ANN. § 1.07(a)(1). By contrast, an "omission" is defined as a "failure to act." TEX. PENAL CODE ANN. § 1.07(a)(34). Clearly, the two are antithetical concepts: while an "act" encompasses an affirmative action on the part of a person, an omission encompasses a forbearance of action. Typically, an offense committed by omission involves a failure of the defendant to perform an affirmative action when he has a legal duty to do so. *See generally, Billingslea v. State*, 780 S.W.2d 271, 271–277 (Tex. Crim. App. 1989).

*Id.* Despite the legal distinction between an act and an omission, the jury does not have to agree unanimously that a defendant caused an injury by act or by omission to convict a person of injury to a child under Section 22.04. *Jefferson v. State*, 189 S.W.3d 305, 306 (Tex. Crim. App. 2006).

15

aggravated B.R.'s injuries is a conclusion reached by speculation. As such, it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt. *See id.* We sustain Appellant's first issue.

In her second issue, Appellant challenges the sufficiency of the evidence supporting the jury's finding that she intentionally or knowingly caused serious mental impairment or injury. As noted previously, the offense of injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct but to the result of that conduct. *Williams*, 235 S.W.3d at 750. A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. PENAL § 6.03(a). A person acts knowingly with respect to a result of his conduct when he is aware his conduct is reasonably likely to cause the result. *Id.* § 6.03(b). Therefore, the State had to prove that Appellant intentionally or knowingly caused the resulting mental injuries to B.R. *See Johnston v. State*, 150 S.W.3d 630, 634 (Tex. App.—Austin 2004, no pet.). "The formulated distinction between intentional and knowing, as to results, is thus between desiring the result and being reasonably certain that it will occur." *Id.* at 635 (quoting *Dusek*, 978 S.W.2d at 134). When the State charges a defendant with conduct by omission, proof that the defendant knowingly caused the result requires evidence that the defendant had a reasonably certain awareness that the injury would have been prevented had the defendant performed the act that was omitted. *Patterson v. State*, 46 S.W.3d 294, 302 (Tex. App.—Fort Worth 2001, no pet.). The jury may infer both intent and knowledge from any facts that tend to prove the existence of these mental states, including the defendant's acts, words, or conduct, and from the nature of the injury inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

Appellant contends that there is no evidence upon which a rational jury could conclude that she intentionally or knowingly caused B.R. to suffer serious mental

16

impairment or injury. She supports this contention in large part upon Reid's response to the following question: "Did you ever form an opinion as to whether [Appellant] intentionally or knowingly caused mental injury to her daughter?" Reid began her response with: "Not in those legal terms." The State argues that "Reid testified that the outcome of the trauma *could have* been significantly different had appellant acted on B.R.'s medical needs and trauma" (emphasis added). In support of this proposition, the State cites a publication from the U.S. Department of Veterans Affairs' "National Center for PTSD" pertaining to "child sexual abuse," which states: "Children can recover from sexual abuse and go on to live good lives. The best predictor of recovery is support and love from their main caregiver."

Even in the light most favorable to the State, our review of the record leads us to conclude that the record is devoid of evidence that Appellant failed to act because she desired B.R. to suffer serious mental impairment or serious mental injury. Further, we conclude that there is no evidence in the record that Appellant was aware that her failure to act was reasonably certain to cause B.R. serious mental impairment or injury or that B.R.'s PTSD would have been prevented had she provided such care. Moreover, there is insufficient evidence to the effect that, if Appellant had provided medical care for B.R., the medical care would have prevented B.R. from suffering PTSD in light of the sexual assault committed by Crippen.

As was the case with Count One pertaining to serious bodily injury, the State also alleged in the indictment that Appellant caused mental injury to a child by omission by failing to provide medical treatment for B.R. after an injury. The same analysis is applicable to Count Two; the evidence did not show that any delay in medical treatment attributable to Appellant caused B.R. any additional mental injuries because no medical treatment was given to B.R. when Butz examined her at the hospital. At trial and on appeal, the State expands its contention to assert that Appellant is guilty of injury to a child by omission by failing to provide a "nurturing

17

environment" for B.R. The State additionally contends that Appellant engaged in this conduct intentionally and knowingly.

There is no doubt that the vast majority of parents in Appellant's position would have acted in a very different manner than she did. Despite the absurdity of her conduct, there is no evidence that Appellant undertook this course of conduct with the conscious objective or desire to cause B.R. to suffer serious mental impairment or injury or that she was aware that her conduct was reasonably likely to cause serious mental impairment or injury. *See* PENAL § 6.03(a), (b). While the National Center for PTSD declares the proposition that "[t]he best predictor of recovery [for victims of child sexual abuse] is support and love from their main caregiver," there is no evidence that this fact was known by Appellant or the public at large. Additionally, the evidence that Appellant's acts and omissions caused B.R. serious mental impairment or injury is also insufficient. Based upon the evidence offered at trial, the conclusion that Appellant's conduct caused mental injury over and above that caused by Crippen's aggravated sexual assault is a matter of conjecture and speculation. *See Hooper*, 214 S.W.3d at 15–16. We sustain Appellant's second issue.

We must now determine the appropriate disposition in this case. In *Bowen v. State*, the Texas Court of Criminal Appeals determined that there are instances when a court of appeals may modify a judgment and render a judgment of conviction for a lesser included offense when the court of appeals has found the evidence insufficient to support an appellant's conviction for a greater-inclusive offense. 374 S.W.3d 427, 432 (Tex. Crim. App. 2012). This step may be taken even if the lesser included offense was not submitted to the jury. *Id.* In *Thornton v. State*, the court subsequently clarified the holding in *Bowen* as follows:

> [A]fter a court of appeals has found the evidence insufficient to support an appellant's conviction for a greater-inclusive offense, in deciding

18

whether to reform the judgment to reflect a conviction for a lesser-included offense, that court must answer two questions: 1) in the course of convicting the appellant of the greater offense, must the jury have necessarily found every element necessary to convict the appellant for the lesser-included offense; and 2) conducting an evidentiary sufficiency analysis as though the appellant had been convicted of the lesser-included offense at trial, is there sufficient evidence to support a conviction for that offense? If the answer to either of these questions is no, the court of appeals is not authorized to reform the judgment. But if the answers to both are yes, the court is authorized—indeed required—to avoid the "unjust" result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense.

425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014) (footnote omitted).

With respect to Count One pertaining to Appellant's conviction for recklessly causing serious bodily injury by omission to B.R., her conduct in recklessly causing nonserious bodily injury by omission would be a lesser included offense. *See* PENAL § 22.04(a)(3), (f). However, the lack of evidence that she caused any physical injury to B.R. by omission precludes us from determining that the evidence is sufficient to support a conviction for the lesser included offense.

As for Count Two pertaining to Appellant's conviction for intentionally or knowingly causing serious mental impairment and injury, committing the offense with the culpable mental state of recklessness would be a lesser included offense. *See id.* § 22.04(a)(2), (e). "A person acts recklessly . . . when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). The risk created "must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* Recklessness requires the defendant to actually foresee the risk involved and to consciously decide to ignore it. *Williams*, 235 S.W.3d at 751. Determining whether an act or omission involves a substantial and

unjustifiable risk requires an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight. *Id.* at 753. "[M]ere lack of foresight, stupidity, irresponsibility, thoughtlessness, ordinary carelessness, however serious the consequences may happen to be," does not rise to the level of criminal recklessness. *Id.* at 751 (quoting *People v. Carlson*, 26 N.Y.S.2d 1003, 1005 (N.Y. Cnty. Ct. 1941)) (internal quotation marks omitted).

Even viewing the evidence in the light most favorable to the State, the evidence was insufficient for a rational jury to find beyond a reasonable doubt that Appellant was subjectively aware of and consciously disregarded a substantial and unjustifiable risk that B.R. would suffer serious mental impairment and injury as a result of her conduct. The lack of subjective awareness at the time of her conduct precludes a finding that the evidence is sufficient to support a conviction for the lesser included offense based on recklessness.

*This Court's Ruling*

We reverse the trial court's judgments of conviction and render judgments of acquittal on both counts.


JOHN M. BAILEY
JUSTICE


September 17, 2015

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

20